**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL | ) ) ) | |
| Plaintiffs, | ) ) | Civil Case No.: 1:04-CV-331 JD |
| v. | ) ) | |
| GUILFORD TRANSPORTATION INDUSTRIES, INC., PAN AMERICAN AIRWAYS CORP., BOSTON-MAINE AIRWAYS CORP., | ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM ON THE REQUIREMENT THAT PLAINTIFF POST A SUBSTANTIAL BOND AS A CONDITION FOR ISSUANCE OF ENFORCEABLE TEMPORARY OR PRELIMINARY INJUNCTIVE RELIEF**

In accordance with the Court's Order dated September 30, 2004, Defendants explain the mandate imposed by the Norris-La Guardia Act that requires the Plaintiff to provide a substantial bond as a necessary predicate to the Court's issuance of the temporary and preliminary injunctive relief they seek, which also bears directly on the enforceability of the temporary injunctive relief, as amended, that the Court has already entered against Defendants. The legal requirements for a Norris-La Guardia labor injunction are discussed in section IV, below.

Defendants also provide information under seal pursuant to the protective order entered by the Court on October 5, 2004, relating to the financial condition of Pan Am and addressing the amount of the bond or undertaking that the Court should impose in conjunction with entry of

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

the Order issued on September 30, 2004 as to operations of the Defendants pending entry of a ruling on Plaintiff's motion for preliminary injunction.[1]

### I.   PAN AM OPERATIONS

It is undisputed that Pan Am advised the Federal Aviation Administration ("FAA") in June 2004 that it would discontinue operations by the end of October.  In fact, Pan Am will discontinue operations on October 31, 2004; it will not operate thereafter.  See Confidential Declaration of John R. Nadolny, appended hereto as Exh. A ["Nadolny Aff"] at ¶ 2.

As testified by Pan Am officer John R. Nadolny at the preliminary injunction hearing conducted on September 9-10, 2004 and as stated in its briefing to the Court, Pan Am is discontinuing its operations because of chronic operating losses, and for no other reason. [Hearing on Preliminary Injunction, Day 2 Tr. at 64]   Specifically, since it commenced operations in 1998, Pan Am has cumulative losses of **REDACTED**.  [Nadolny at ¶3 and Confidential Exh. 1 (Pan Am Statement of Operations and Accumulated Deficit)]  In 2003, Pan Am had revenues of **REDACTED** against operating expenses of **REDACTED**, for a net operating loss **REDACTED**.[2]  [Nadolny at ¶ 4 and Confidential Exh. 1]

This trend has continued in 2004.  At present and for all or most of 2004, Pan Am has been on a cash-only basis with its key suppliers.  That is, the suppliers will only deliver supplies and services if they are paid in cash before delivery.  [Nadolny at ¶ 5]  This includes the vendors from whom Pan Am obtains the most basic of supplies and services needed to operate: jet fuel,

---

[1]  Defendants do not at this time present evidence going directly to the amount of bond that would be required if the Court should enter an order granting a preliminary injunction.  As argued in Section VI of Defendants' Objections, filed October 4, 2004, the terms of the recommended order are insufficient and, in any event, until the terms of the order are known Defendants cannot fairly estimate the impact on their business operations (see, e.g., fn. 6, *infra*). Accordingly, in their Objections, Defendants requested a hearing on the amount of a bond and would present evidence at that time keyed to the terms of the order.

[2]  Adjusting for depreciation and non-operating expenses (taxes and interest expense), Pan Am's loss for 2003 was **REDACTED**.  [Nadolny at ¶ 4 and Confidential Exh. 1]

ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004

aircraft and engine maintenance supplies and service, aircraft and engine parts ground handling services, landing rights, rent, brakes and tires, and heat for maintenance and operations facilities. [Nadolny at ¶ 5 and Confidential Exh. 2 (Pan Am Vendor List)]

As of the end of June 2004, the month Pan Am gave notice to the FAA, it had operating revenue of **REDACTED** against operating expenses of **REDACTED** for a year-to-date net operating loss after six months of **REDACTED**. [Nadolny at ¶ 6 and Confidential Exh. 3 (Pan Am Income Statement, June 2004] Quarterly figures for the third quarter of 2004 have not yet been compiled, but operating results for July, August and September have been no better than the first six months, and likely worse. [Nadolny at ¶ 7]

Based upon these results, it is fair to infer that if Pan Am were to continue to operate past its scheduled discontinuance of operations on October 31, 2004, it would lose between **REDACTED** (average operating loss for first six months of 2004) per month and **REDACTED** per month (average operating loss per month in 2003).[3] Notably, Pan Am's 2003 operating loss **REDACTED** its cost for payroll and employee benefits (respectively, **REDACTED**). [See Confidential Exh. 1 to Nadolny Declaration] In other words, even with wage and benefit concessions from its employees (which Pan Am has not requested and which no employee group, including ALPA, has offered), Pan Am cannot survive, much less make money as a going concern.

## II.   INDEMNIFICATION OF CUSTOMER LOSSES

Since Pan Am will discontinue operations in a matter of weeks, as discussed in its prior Notice to the court of its intent to inform passengers, FAA regulations require that Pan Am

---

[3] Although Pan Am supplies these projection to show the Court that the financial stakes from ALPA's demands are significant, Pan Am respectfully repeats that it will not continue to operate. Its suppliers have had it on a cash-only basis for months and its owners will not continue to fund daily operating deficits. As soon as Pan Am ceases to pay up front for deliveries of fuel, maintenance, parts, etc., it will be grounded.

notify its passengers at the earliest practicable date and offer an immediate refund so as to give the passengers the best opportunity to rebook their travel with another carrier. The intent behind this regulation is manifest: delayed notice means fewer opportunities and higher cost to the customers, because airlines follow a pricing scheme structured to reward those who book travel early with discounts subsidized by higher fares charged to those passengers who book near their travel date. Accordingly, the longer Pan Am is restrained from notifying its passengers, the greater the likelihood that passengers will be forced to pay more to rebook than (1) they paid Pan Am (with whom, by definition, they booked early) and (2) they would have paid another airline if Pan Am had notified them on or about October 1, as planned. [See Nadolny at ¶ 8-9]

Pan Am will be obliged to pay some or all of its customers the fare differential between what they are charged upon rebooking and the cost of their Pan Am ticket. [See Nadolny at ¶ 8-9] In many if not most cases, the differential will be greater due to delayed notice of cancellation from Pan Am due to the September 30, 2004, Order barring Pan Am from complying with DOT consumer protection regulations and providing its customers timely notice. [See Nadolny at ¶ 8-9] Pan Am estimates this differential as $387,000 for the 3,870 passengers booked for flights in November, if Pan Am is unable to give these passengers notice prior to October 31. [Nadolny at ¶ 8-9]

The basis for projecting passenger rebooking claims and costs related to delayed notice for December and beyond is similar, however, Pan Am assumes also that the present Order will by then have been supplanted by a decision on the motion for preliminary injunction, and further, that some passengers will learn from other sources that Pan Am has discontinued operations.[4]

---

[4] In fact, ALPA has already posted a press release on its web site reporting to all the world that Pan Am has announced plans to discontinue service as of October 31, 2004. A copy of the release as posted on ALPA's web site is appended as Exhibit B. Pan Am respectfully submits that ALPA has by its own conduct rendered moot whatever

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

Accordingly, to the extent that the Order may extend beyond November 1, 2004, bringing passengers with December flights within a month or so of their flying dates, the amount of the bond keyed to losses from passenger claims should be modified at that time; in the alternative, the amount requested above to indemnify claims by passengers flying in November should be doubled, to protect Pan Am against all claims.

### III.   LEGAL EXPENSES AND COSTS

To date, Defendants have incurred legal expenses of approximately $148,000 in defending against ALPA's demand for emergency relief in the form of a temporary restraining order and a preliminary injunction. [Nadolny at ¶ 10] Defendants reasonably project that these expenses will more than double if further relief is entered because Defendants will file appeal to the First Circuit and seek expedited review, as provided by the Norris-La Guardia Act. *See* 29 U.S.C. § 110.

### IV.   LEGAL REQUIREMENTS OF THE NORRIS-LA GUARDIA ACT

Section 1 of the Norris-La Guardia Act ("NLA") states that the federal courts shall not have jurisdiction to issue any restraining order or temporary or permanent injunction in a case "involving or growing out of a labor dispute" unless the restraining order or injunction is issued "in strict conformity with the provisions of this chapter."  29 U.S.C. § 101.  One of the "provisions" of the NLA that must be satisfied by any plaintiff seeking an injunction is the requirement to post a substantial bond.  Section 7 of the NLA provides that:

> [N]o temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous

---

"status quo" existed that would prohibit Pan Am from complying with its FAA-mandated obligation to give passengers timely, direct notice of its plans.

>   issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and substantially denied by the court.

29 U.S.C. § 107. The absence of a bond meeting the requirements of section 7 is "fatal" to the granting of the relief prayed for. *See, e.g., Tejidos de Coama, Inc. v. Int'l Ladies' Garment Workers' Union*, 22 F.3d 8, 14 (1st Cir. 1994) (vacating injunction because, <u>inter</u> <u>alia</u>, "[no] bond was filed to cover damages including attorney's fees, as section 7 also requires"); *Cupples v. American Federation of Labor*, 20 F. Supp. 894, 899 (E.D. Mo. 1937). The purpose of the bond requirement is, as stated in the NLA, to recompense the wrongfully enjoined for "any" (not "some") loss, expense, damage, costs, or fees caused by the injunction. *See also* Wright & Miller, Federal Practice and Procedure, § 2954 ("Accordingly, the judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.")

The case at hand is a classic "labor dispute" that is governed by the requirements of the NLA. Section 13 of the Act defines "labor dispute" to include "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment…." 29 U.S.C. § 113(c). Importantly, the term "labor dispute" has a "broader meaning for purposes of the Norris-La Guardia Act than for the RLA." *Int'l Association of Machinists and Aerospace Workers v. Eastern Air Lines, Inc.*, 826 F.2d 1141, 1145 (1st Cir. 1987). For example, in *Eastern Air Lines* the airline's decision to layoff 68 mechanics and the

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

union's attempt to prevent the layoffs from taking effect was found to be a "classical labor dispute" and was thus within the ambit of the NLA. *Id.; see also Brotherhood of Maintenance of Way Employees v. Guilford Transportation Indus., Inc.*, 803 F.2d 1228, 1233 (1st Cir. 1986) ("it was intended by Congress that the [labor dispute] provision be broadly interpreted"); *Tejidos de Coama*, 22 F.3d at 11 (same).

Because this case is subject to the NLA, the bond to be posted by ALPA must take into account all of the Defendants' potential losses, expenses, damages, costs, and fees. In *Int'l Association of Machinists and Aerospace Workers v. Eastern Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991), the First Circuit found that the NLA -- **not** Rule 65(c) of the Federal Rules of Civil Procedure -- dictates the requirements for a bond in a case involving a labor dispute. The rules of equity enunciated by the Federal Rules of Civil Procedure are trumped by the policy announced by Congress in the NLA. *Cf. Eastern Airlines*, 826 F.2d at 1147 ("In the case of a labor dispute a court of the United States has no *traditional* preliminary injunctive power") (emphasis in original). Indeed, the plain language of Rule 65(e) states that the Rule does "not modify any statute of the United States relating to…preliminary injunctions in actions affecting employer and employee…" Fed. R. Civ. P. Rule 65(e). As stated above and as established by the second *Eastern Airlines* decision, Section 7 of the NLA "requires the filing of a bond covering losses, expenses and damages." *Id.*, 925 F.2d at 9. Further, Section 7 of the NLA requires that in addition to covering for any losses, expenses and damages, the bond must be set to cover "all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief." 28 U.S.C. § 107. *See also Eastern Airlines*, 925 F.2d at 9 ("Section 7 of the Norris-LaGuardia Act clearly expresses the

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

Congressional intent to require that preliminary injunction undertakings in labor disputes include a provision for reasonable attorneys' fees.").

The bond issued by the ALPA in this case must be substantial enough to cover all of the Defendants' potential losses, expenses, damages, costs, and attorneys fees. Without a substantial bond, each of them losses, expenses, damages, costs, and attorneys fees. Without a substantial bond, Pan Am runs the risk of substantial, unrecoverable loss in the event that an order against its interests is later overturned as having been improvidently granted. It has long been held that a party injured by the erroneous issuance of an injunction "has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 770, n. 14 (1983). Indeed, the First Circuit has established that, in cases governed by the NLA, the "injunction bond rule" mandates that an injured party's recover is limited to the amount of the bond. *Eastern Airlines*, 925 F.2d at 10. Thus, in that case the airline was unable to recover its attorneys fees and other expenses and damages that exceeded the $50,000 bond set by the District Court and posted by the Union. *Id.* In this case, a far more substantial bond is warranted to avoid inflicting unrecoverable damages on the Defendants as a consequence of an improperly issued injunction. *See, e.g., Alton & Southern Railway Co. v. Brotherhood of Maintenance of Way Employees*, 899 F. Supp. 646 (D.D.C. 1995) (following *Eastern Airlines* and finding that it would be "manifestly unjust" to limit the Defendant's recovery; increasing bond from $1,000 to $100,000); *Chicago and North Western Railway Co. v. United Transportation Union*, 471 F.2d 366, 368 (7th Cir. 1972) (noting in NLA case that the defendant employees were covered by a million dollar bond pending decision on appeal).

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

## V.    AMOUNT AND STYLE OF BOND OR SIMILAR UNDERTAKING

**1.    Pre-October 31 Undertaking**

As Defendants appreciate the immediate question to be addressed, the Court has requested a showing by Pan Am as to what undertaking would be appropriate to protect it against harm it will suffer from the Order entered at ALPA's request to preserve the status quo pending a decision by the Court on the Report and Recommendation regarding ALPA's motion for preliminary injunction, and thereby avoid an effective penalty for defending itself in this action. In responding, Pan Am apprehends that the Court apparently intends to rule very quickly, and in any event prior to October 31, such that only losses or harm prior to that date are at issue today.

Consistent with the limitation that the First Circuit places on recovery from a bond, and the admonition in the NLA that the bond should be set high enough to indemnify **all** losses, the bond posted by ALPA should be set at $700,000, the higher level of projected costs to indemnify customer losses from delayed notice plus current and projected defense costs.

**2.    Post October 31 Undertaking**

In the event that the Order may be in effect past October 31 or another restraining order is issued by the Court, then an undertaking in addition to the bond discussed above is required. However, Pan Am respectfully suggests that a straightforward bond is not adequate security nor would do anything to address Pan Am's massive daily cash requirements or otherwise cover the substantial operating losses set forth above and in Mr. Nadolny's affidavit. First, as we argued in our brief to the Court opposing ALPA's emergency request to modify the TRO, the law does not empower the Court to order a company to stay in business. In fact, all the authority is precisely to the contrary. Courts have consistently refused to issue injunctions to stop businesses closing,

9

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

especially where they happen to be losing money -- like Pan Am.  *See, e.g., Airline Pilots Association International, and International Brotherhood of Teamsters, Airline Division v. Transamerica Airlines, Inc*., 1986 US DIST LEXIS 20590, 123 L.R.R.M. 2682 (E.D. N.Y. 1986); *Teamsters Local Union 299 v. U.S. Truck Co. Holdings, Inc.*, 87 F.Supp.2d 726 (E.D. Mich. 2000);  *Local 274, Hotel Employees and Restaurant Employees v. Westin Bellevue Stratford*, 633 F. Supp. 869 (E.D. Pa. 1986); *United Auto Workers v. Lester Engineering Co.*, 718 F.2d 818 (6th Cir. 1983).  For example, in *Transamerica* the District Court found that the airline was not required to bargain over going out of business.  The Court denied the union's bid for a preliminary injunction that would have forced the money losing airline to continue operations.  *Id*. at 21.  The Court found that the balance of hardships necessary to examine when considering issuing an injunction was clearly in favor of the airline, which was losing significant amounts of money.  *Id*. at 20.  Similarly, the Courts in *Teamsters* and *Local 274* established that an injunction was not proper to stop a business from closing because even if the closing was determined to be improper by an arbitrator, the union and employees would not suffer irreparable damage because money could compensate them for their injuries.

Indeed, the Supreme Court has established that a business has an undeniable right to shut down whenever it wants, for whatever reason it wants. *Textile Workers Union of America v. Darlington Manufacturing Co. et al*, 380 U.S. 263, 273-274 (1965) ("when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such an action is not an unfair labor practice").  This holding expressly applies to companies subject to the Railway Labor Act.  *Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Association*, 491 U.S. 490, 509 (1989) ("although *Darlington* arose under the NLRA, we are convinced that we should be guided by the admonition in that case that the decision to close

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

down a business entirely is so much a management prerogative that only an unmistakable expression of congressional intent will suffice to require the employer to postpone a sale of its assets…the decision of a railroad employer to go out of business and consequently to reduce to zero the number of available jobs is not a change in the conditions of employment forbidden by the status quo provision"). *Accord Ines Torres-Matos v. St. Lawrence Garment Co. Inc.*, 901 F.2d 1144, 1146 (1st Cir. 1990).[5]

In reply, ALPA has argued that the Court may order such relief because Pan Am is not really going out of business. ALPA is entitled to say and believe whatever it likes, but the fact is Pan Am **really is** going to discontinue operations by the end of October, unless ALPA wishes to provide Pan Am a multi-million dollar, no recourse line of credit. Pan Am simply does not have the cash flow to sustain operations. No bond can pay for jet fuel delivered to Pan Am on a cash and carry basis. No bond can pay for maintenance, repair parts, brakes and tires. No bond can pay the salary of ALPA pilots, or the salaries of Pan Am's other employees. And without fuel, maintenance and crews, no Pan Am aircraft are leaving the ground. Accordingly, if Pan Am is ordered to stay in business despite all the authority to the contrary, then the only adequate undertaking to secure ongoing operations will be an open ended, no-interest, non-recourse credit line from a reputable financial institution to be arranged by ALPA, a credit line that would be funded at a level equal to or greater than Pan Am's maximum average monthly losses (i.e., **REDACTED** per month) times the number of months that the Order is expected to be in effect pending a ruling on the motion for preliminary injunction and, if the motion is granted, pending a

---

[5] Magistrate Muirhead acknowledged these fundamental and established principles, as well, in his Report and Recommendation at 23 ("Pan Am's owners, not its employees, determine how long it operates.").

11

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

full hearing on the merits.[6]  Further, the operating loss credit line posted by ALPA as an additional undertaking should be conditioned to be deemed repaid in full upon satisfaction of the same conditions as would entitle Pan Am to draw upon a traditional bond.

Finally, to the extent that the Order is expected to be in effect after October 31 pending a ruling on the motion for preliminary injunction and, if the motion is granted, a full hearing on the merits, the undertaking should include after further showing by Defendants such additional direct projected losses as BMAir and Guilford might show based upon the final structure of the relief entered (see fn. 6, *supra*).

                                Respectfully submitted,

**GUILFORD TRANSPORTATION INDUSTRIES, INC., PAN AMERICAN AIRWAYS CORP., AND BOSTON-MAINE AIRWAYS CORP.**

By Their Attorneys,
RANSMEIER & SPELLMAN
PROFESSIONAL CORPORATION

Dated: October 6, 2004         By:    /s/ Marie M. McPartlin
                                                    R. Matthew Cairns (NHBA # 411)
                                                    Marie M. McPartlin (NHBA #14581)
                                                    One Capitol Street,
                                                    P.O. Box 600
                                                    Concord, NH  03302-0600
                                                    Tel. (603) 228-0477
                                                    matt@ranspell.com

---

[6]  In this regard, Pan Am also notes that the amount of the "operating losses" portion of the bond should be adjustable upward on request of Pan Am in the event that a hearing and ruling on the merits are delayed past the time estimated when the bond is first set.  Defendants further note that if the Order extends for any appreciable length of time, and certainly if it extends past October 31, then co-Defendants Guilford and BMAir will suffer direct harm from their inability to conduct operations they were not conducting on September 17, or operations that are different than those conducted on September 17.  For example, as of November 1 Guilford will no longer be receiving lease revenues of **REDACTED** per plane per month from Pan Am [Nadolny at ¶ 11], and evidently would be restricted from leasing its planes to another airline.

**ORIGINAL FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ENTERED OCTOBER 5, 2004**

Of Counsel:

| | |
|---|---|
| Joseph E Schuler, Esquire | William G. Miossi, Esquire |
| Winston & Strawn, LLP | Winston & Strawn, LLP |
| 1400 L Street NW | 1400 L Street NW |
| Washington, DC 20005 | Washington, DC 20005 |
| 202-371-5769 | 202-371-5708 |
| jschuler@winston.com | wmiossi@winston.com |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this filing will be served via ECF on Attorneys Migliore, Glass and Serrell.

/s/ Marie M. McPartlin
Marie M. McPartlin

307930