```
             UNITED STATES DISTRICT COURT FOR THE
                   DISTRICT OF NEW HAMPSHIRE
```

Air Line Pilots Association
International

    v.                                    Civil No. 04-cv-331-JD
                                          Opinion No. 2006 DNH 115

Guilford Transportation
Industries, Inc. et al.


O R D E R

Following a remand from the First Circuit, the defendants, Guilford Transportation Industries, Inc. ("Guilford"), Pan American Airways Corp. ("Pan Am"), and Boston-Maine Airways Corp. ("Boston-Maine"), move for summary judgment. The plaintiff, Airline Pilots Association, International ("ALPA"), objects to the motion, arguing that there are disputed issues of material fact that necessitate a trial. The defendants also move to strike certain materials supporting ALPA's opposition to the motion for summary judgment. Also before the court are motions relating to the pending trial.

## Standard of Review

Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant must establish that the record is devoid of

any genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A disputed fact is material only if it "might affect the outcome of the suit under the governing law."  Id. at 248.  In reviewing the summary judgment record, the court must resolve all reasonable inferences and all credibility issues in favor of the nonmoving party.  See id. at 255.

## Background

Because the travel of this case has been stated before,[1] the court provides only a brief summary of the procedural history, followed by a description of the First Circuit's remand order.

ALPA brought the present action under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188, seeking an injunction to prevent the defendants from effectively transferring Pan Am's unionized commercial airline business to the non-union Boston-Maine.  See

---

[1] Previous orders of this court, and the opinion of the First Circuit remanding this case, provide a more thorough discussion of the procedural and factual history of this case.  See Air Line Pilots Assoc., Int'l v. Guilford Transp. Indus., Inc., 399 F.3d 89 (1st Cir. 2005) ("Air Line Pilots II"); Air Line Pilots Assoc., Int'l v. Guilford Transp. Indus., Inc., 360 F. Supp. 2d 262 (D.N.H. 2004) ("Air Line Pilots I").

Air Line Pilots II, 399 F.3d at 92-93 (describing the RLA's statutory scheme and the limits it imposes on judicial involvement in labor disputes). ALPA alleged that Pan Am sought to avoid the obligations of the collective bargaining agreement ("CBA") it had entered with ALPA by transferring its work to its non-unionized affiliate.[2] In September 2004, a magistrate judge conducted an evidentiary hearing, issued a report and recommendation, and granted ALPA's motion for a temporary restraining order.

This court adopted the magistrate judge's report and recommendation finding that a "major" dispute existed under the RLA. Air Line Pilots I, 360 F. Supp. 2d at 269-70. Accordingly, this court granted a preliminary injunction ordering the defendants to, inter alia, refrain from using Boston-Maine to operate large jet aircraft. Id. at 288.

While the defendants' interlocutory appeal was pending with the First Circuit, Pan Am's operations were shut down notwithstanding that the injunction prevented Boston-Maine from picking up Pan Am's business. The defendants asserted that the closure was necessitated by Pan Am's significant and consistent financial losses. Finding that this court had misconstrued the scope of its jurisdiction under the RLA, the First Circuit

---

[2] Pan Am and Boston-Maine are both wholly-owned subsidiaries of non-party Pan American Airlines, Inc. Although it does not have any ownership interest in either Pan Am or Boston-Maine, Guilford leased Boeing 727s to both companies. The only party to the CBA with ALPA was the subsidiary Pan Am.

vacated the injunction and remanded for further proceedings. See Air Line Pilots II, 399 F.3d at 106. That decision decisively rejected all but one of ALPA's theories for judicial intervention. See id. at 98-105.

The First Circuit defined the sole issue surviving appeal as whether "Pan Am was shut down only because it was possible to transfer its union-flown routes to a non-union affiliate--and, if so, that a major dispute was thereby created." Id. at 103. The court noted that the decision to close a business, even a unionized business, is at the prerogative of the owners. Id. at 100. Thus, when dealing with a business decision to shut down a unionized operation, so long as the operation is actually terminated, and would have been "regardless of the availability of a non-union affiliate as a vehicle for picking up the pieces of [the] abandoned business, the RLA itself creates no restrictions either on the company that is going out of business or on the affiliate that is seeking to salvage the defunct company's operation." Id. at 101.

A major dispute under the RLA may arise from the shutdown of a unionized business only where the employer's sole purpose for shutting down the business was to allow it to transfer union work to a non-union affiliate. Id. at 102. Accordingly, the First Circuit stated that ALPA may obtain judicial relief only if it can show that the defendants' proffered business justification is a "shell game" or a "subterfuge." Id. The court found that ALPA

4

had not met that high standard the first time around.  See id. at 103.  But, although "it seems a long shot," the court concluded that ALPA should be given an opportunity to establish that the defendants' singular purpose in shutting down Pan Am was to escape the terms of the CBA.  Id.

On remand, this court permitted ALPA to seek further discovery directed toward that narrow issue.  See Order (July 8, 2005) at 5.  The court did not impose any temporal limitation, allowing ALPA to supplement the record with material relating to the time period preceding the evidentiary hearing.  See id.

## Discussion

The defendants maintain that Pan Am was closed because of its heavy financial losses.  They argue that ALPA has failed to proffer any evidence rebutting the legitimacy of management's financial decision to shut down Pan Am, let alone to establish that Pan Am's operation was terminated for the explicit purpose of transferring union work to a non-union affiliate.  As support, the defendants assert that they informed the Federal Aviation Administration ("FAA") of the decision to close Pan Am at a meeting in early May 2004, and it is undisputed that Pan Am then followed through with the shut down later that fall.  The defendants further point out that Boston-Maine was not granted FAA authority to fly a large jet aircraft until mid-July 2004, at least two months after the defendants assert that they first

notified the FAA of their plans to shut down Pan Am.

ALPA argues that it has produced evidence showing that, despite Pan Am's undisputed losses, the defendants' purported rationale for shutting down Pan Am was merely a pretext to hide the true motivation -- to make an end run around the CBA and the union. ALPA catalogues evidence from which it claims a trier of fact could reasonably infer an unlawful motivation. But much of that evidence was already considered in the prior proceedings and was dismissed by the First Circuit as insufficient to establish an actionable dispute under the RLA. See Air Line Pilots II, 399 F.3d at 103 ("[A] finding of a major dispute is not sustainable on the record as it now stands.").

The only significant new information submitted by ALPA is the deposition testimony of Robert Barnes, a former vice president at Pan Am and Boston-Maine, concerning some off-hand remarks made by David Fink, the CEO of both companies; the declaration of Robert Burrell, an FAA supervisor, concerning the timing of the defendants' announcement of the plan to close Pan Am; and the declaration of Kye Johanning, an employee of ALPA and a purported financial expert, calling into question the defendants' business justification for shutting down Pan Am.

During his deposition, Barnes stated that Fink had informed him of his intention to perform an "Emmett Kelley routine." Barnes Dep. at 24. Barnes explained that "Emmett Kelley was a clown who used to sweep a beam of light on the stage into a

smaller and smaller pile and with a final sweep, it was gone." Id. Barnes stated that Fink had "indicated that that's what he was doing with Pan Am, . . . and when he got done, there would be nothing left for the Air Line Pilots Association." Id.

ALPA also submits the declaration of Robert Burrell, an FAA supervisor in Portland, Maine, to rebut the defendants' assertion that the decision to discontinue Pan Am's operations was announced to the FAA at a meeting that occurred months before Boston-Maine received FAA authorization to operate large jet aircraft. Burrell's declaration states that, "[i]n response to an inquiry by the Air Line Pilots Association . . . I caused a search to be conducted of the records of the FAA's Portland Office as to meetings or correspondence between representatives of our Office and the [defendants]." Burrell Decl. ¶ 5. Based on his own recollection, and that of his colleagues in the Portland office, Burrell believes that "the first time [the FAA] was informed of a plan for Pan Am to cease operations was in July 2004, some time after Boston-Maine was granted initial authority to add Boeing 727 aircraft to its FAA operating certificate." Id. ¶ 6.

Finally, ALPA submits a declaration from Kye Johanning, an economic analyst employed in ALPA's Economic and Financial Analysis Department. Having reviewed the financial statements of Pan Am, Boston-Maine, and the parent, Pan American Airlines, for the years 2001 to 2005, Johanning concludes that Boston-Maine, at

best, can only hope to duplicate the losses incurred by Pan Am. Johanning Decl. ¶¶ 12-18. Johanning puzzles at why the defendants commenced with the time-consuming and expensive procedure to procure authority for Boston-Maine to operate large jet aircraft when Pan Am, its corporate sibling, already had such authority. Id. ¶ 17. Johanning sees no "economic advantage to the owners to operate two essentially identical airlines." Id. Moreover, Johanning finds the defendants' rationale for closing Pan Am "hard to believe because Pan Am had been losing money at a very substantial rate for years, yet it continued to operate until [Boston-Maine] had acquired the authority to replace it." Id. ¶ 18. Furthermore, Johanning states, "if Pan Am's losses were the reason for the decision to shut it down, then logically [Boston-Maine] would have been shut down as well, because its losses were even worse than Pan Am's." Id. Finally, Johanning opines, if Pan Am were truly concerned about labor costs, "it could have sought to negotiate wage reductions with ALPA rather than close down the airline." Id. at ¶ 19.

   The defendants move to strike substantial portions of the Burrell declaration, including two attached exhibits, and all of Johanning's declaration. Because Burrell was not present for the May 2004 meeting, and the crux of his declaration therefore relies on the statements of other FAA personnel, the defendants argue that those portions of the declaration constitute inadmissible hearsay. See Fed. R. Evid. 801. The defendants

also argue that the official investigation exception is not applicable here, see Fed. R. Evid. 803(8)(C), and even if it were, it would not provide an exception to "hearsay within hearsay." United States v. Mackey, 117 F.3d 24, 28-29 (1st Cir. 1997) ("[H]earsay statements by third persons . . . are not admissible . . . merely because they appear within public records.").

Additionally, the defendants argue that the court should strike Johanning's declaration because ALPA failed to file an expert report summarizing his opinions and reasoning. See Fed. R. Civ. P. 26(a)(2)(B). Because the court concludes that consideration of the disputed material will not help ALPA meet the high standard for establishing a major dispute under the RLA, it is unnecessary to rule on the motion to strike.

The new evidence submitted by ALPA does little to advance its case. Barnes's deposition testimony regarding Fink's "Emmett Kelley routine" comment is nothing more than cumulative evidence of Fink's animus toward ALPA. Similar statements by Fink had already been revealed in the injunction proceedings, see Air Line Pilots I, 360 F. Supp. 2d at 265 (noting that there was evidence that "Fink regularly expressed his dislike for ALPA and even said in March or April 2004, that 'it was going to be smooth sailing with Boston-Maine as soon as they got rid of all those union jackasses . . . .'"), and did not impress the First Circuit, see Air Line Pilots II, 399 F.3d at 102 n.9 ("evidence of generalized

union animus, though perhaps relevant, is insufficient to establish an unlawful scheme.").

The Burrell declaration is similarly unavailing. Even assuming arguendo that the defendants did not notify the FAA of the planned shutdown of Pan Am until some point in July 2004 after Boston-Maine received permission to operate a large jet aircraft, this hardly establishes that the defendants' business justification for shutting down Pan Am was a subterfuge. The premise of ALPA's argument is that the defendants intended to circumvent the union by transplanting Pan Am's business, root and branch, into Boston-Maine. According to ALPA, "the triggering event that led to the shutdown of Pan Am was not its financial losses, but the ability of defendants finally to carry out their plan to replace Pan Am with [Boston-Maine]." Mem. Opp'n Mot. Summ. J. at 21.

But, the record establishes that in July 2004, Boston-Maine was not positioned to replace Pan Am. At that point, Boston-Maine had only acquired FAA authority to operate a <u>single</u> large jet aircraft <u>domestically</u>, not the fleet of aircraft that Pan Am had authority to operate domestically and internationally.[3] Moreover, as the First Circuit found important, the defendants

---

[3]At its height, Pan Am had authority to operate up to eight Boeing 727 aircraft. See Air Line Pilots I, 360 F. Supp. 2d at 278. At the time of the injunction hearing, Guilford leased six Boeing 727 aircraft to Pan Am, but only one to Boston-Maine. Id. at 279. Moreover, Boston-Maine still does not have authorization to provide international flights, and ALPA itself points out that international flights are more profitable than domestic flights.

followed through with the shutdown of Pan Am notwithstanding that, at that time, Boston-Maine was powerless to take over Pan Am's routes.  See Air Line Pilots II, 399 F.3d at 102 (noting that it was significant that Pan Am shut down operations and surrendered its operating certificate "after the district court had enjoined Boston-Maine from taking on Pan Am's routes").[4]

Finally, even accepting Johanning's declaration, it only establishes, at most, that the defendants made a poor business decision to shut down Pan Am while continuing the Boston-Maine operation.  Nevertheless, as the First Circuit emphasized, the decision to close a business is management's prerogative and does not trigger an obligation to bargain.  Id. at 100.  That better solutions may have been available to the defendants does not establish that their decision to close Pan Am was a sham.  Id. at 102 ("If there is no subterfuge, the closure is in fact legitimate and complete, and . . . the decision to close falls outside the ambit of bargainable disputes under the RLA.").

Moreover, Johanning's starting premise, that Boston-Maine merely duplicates Pan Am, is flawed.  As noted above, Boston-Maine does not have the substantial fleet of large jet aircraft that Pan Am had.  It does, however, have a fleet of smaller aircraft that Pan Am did not have.  The defendants maintain that

---

[4]The court similarly finds insignificant the fact that the minutes of two Pan Am meetings in May and July of 2004 omit reference to the planned shut down of Pan Am.

they expect Boston-Maine to eventually succeed where Pan Am failed because of its lower maintenance and labor costs, and because of the additional cash flow generated from its smaller aircraft routes.

Finally, Johanning claims that Boston-Maine was a worse performer on a "margin basis" (i.e, losses as a percentage of revenues).  Johanning Decl. ¶ 13.  But he concedes that "in absolute terms," Pan Am was the bigger loser.  Id.  Indeed, looking at Johanning's comparison for 2003 and 2004, it appears Boston-Maine lost just over $19 million, while Pan Am lost more than $45 million.  Id. ¶¶ 12-13.  The defendants were not required to employ Johanning's criteria to measure the performance of the two airlines.  Nor were they obligated to negotiate a wage reduction with ALPA's members before shutting down Pan Am.

In the end, ALPA simply cannot meet the high bar that has been set for judicial intervention in RLA cases.  The court reads the precedent to require, in business closure cases such as this, nothing short of a smoking gun establishing that management was motivated solely by an unlawful desire to rid itself of the obligation to bargain with a union.  The First Circuit found no smoking gun in its review of the court's initial decision, and this court finds none now.  ALPA's claims fall short, as a matter of law, of establishing a major dispute under the RLA.  Therefore, ALPA has no recourse in this court.  See Air Line

Pilots II, 399 F.3d at 105.

Because the defendants are entitled to summary judgment, the motions of both parties relating to trial are considered to be moot.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (document no. 153) is granted.  The defendants' motions to strike (document no. 163) and to exclude testimony (document nos. 179, 180), and the plaintiff's motion to take trial depositions (document no. 173), are denied as moot.  The clerk shall enter judgment in favor of the defendants and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

October 3, 2006

cc:  Jerry D. Anker, Esquire
     R. Matthew Cairns, Esquire
     Julie P. Glass, Esquire
     Eric L. Hirschhorn, Esquire
     Marie M. McPartlin, Esquire
     Marcus C. Migliore, Esquire
     William G. Miossi, Esquire
     Gina M. Petro, Esquire
     Andrew W. Serell, Esquire